**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**LATASHA RODGERS**                              **CIVIL ACTION**


**VERSUS**                                       **CASE NO. 16-16303**


**MARLIN GUSMAN, et al.**                        **SECTION: "G" (3)**


<u>**ORDER AND REASONS**</u>

In this litigation, Plaintiff Latasha Rodgers, Tutrix ("Plaintiff"), on behalf of her minor child CJTJ, alleges that Defendants Orleans Parish Prison, Orleans Parish Sheriff Marlin Gusman ("Gusman"), the City of New Orleans (the "City"), Mayor Mitch Landrieu, the New Orleans City Council, Correct Care Solutions, LLC ("CCS") and certain unidentified parties acting under the authority of the Orleans Parish Prison, subjected CJTJ's father ("Decedent"), a pretrial detainee at the Orleans Parish Prison, to excessive force, assaulted and battered Decedent, and acted with deliberate indifference to his medical needs, resulting in Decedent's death, in violation of his and Plaintiff's constitutional rights under the Fourth, Eighth, and Fourteenth Amendments, and Louisiana law.[1] Pending before the Court is CCS's Motion to Exclude or Limit the Testimony of William Anderson.[2] Having considered the motion, the memoranda in support and opposition, the record, and the applicable law, the Court will deny the motion and allow the parties until August 2, 2019 to complete any outstanding depositions of Dr. William Anderson.

---

[1] Rec. Doc. 143 at 1–4.

[2] Rec. Doc. 180.

1

# I. Background

## A.    *Factual Background*

In the second amended complaint, Plaintiff avers that on September 24, 2015, Decedent was a pretrial detainee at the Orleans Parish Prison ("OPP").[3] Plaintiff additionally avers that Decedent had been diagnosed with Sickle Cell Disease and Hepatitis C, which was "verified by OPP medical intake form."[4] Plaintiff alleges that since October 2015, Decedent had experienced leg pain and medical complications in the chest and abdomen.[5] According to Plaintiff, however, OPP failed to provide Decedent with his medication or take him to the hospital.[6] In addition, Plaintiff alleges that on October 3, 2015, Decedent was attacked and stabbed in the arm by an inmate, and on another unidentified occasion, Decedent was choked by a security guard.[7] Plaintiff avers that Decedent was not taken to the hospital on either occasion.[8]

According to Plaintiff, Decedent experienced a severe sickle cell pain crisis in his abdomen and lower extremity, chest, back, and left leg on November 11, 2015, but was not taken to the hospital until the next day on November 12, 2015.[9] While Decedent was at University Medical Center, Plaintiff avers, his condition worsened—he became diaphoretic and unresponsive, had

---

[3] Rec. Doc. 143 at 4.

[4] *Id.*

[5] *Id*.

[6] *Id*.

[7] *Id*.

[8] *Id*.

[9] *Id*.

problems breathing, and on November 15, 2015, he died.[10] Plaintiff alleges that Defendants' conduct demonstrates a "wanton disregard" for Decedent's "serious medical needs."[11]

## B.    *Procedural Background*

Plaintiff filed a complaint on November 10, 2016.[12] On December 12, 2016, Defendant Marlin Gusman filed an answer to the complaint.[13] On February 6, 2017, the Court granted Defendant Orleans Parish Sheriff Office's motion to dismiss.[14] On March 27, 2017, Defendants Mayor Mitch Landrieu and the New Orleans City Council filed a motion to dismiss.[15] On October 16, 2017, the Court denied the motion to dismiss without prejudice and granted Plaintiff leave to amend the complaint to address the deficiencies noted therein.[16]

On November 17, 2017, Plaintiff filed an amended complaint.[17] On July 18, 2018, the Court denied CCS's motion to dismiss without prejudice and granted Plaintiff leave to amend the complaint to address the deficiencies noted therein.[18] On July 18, 2018, the Court also denied Gusman's motion for judgment on the pleadings without prejudice and granted Plaintiff leave to amend the complaint to address the deficiencies noted therein.[19] Also on July 18, 2018, the Court

---

[10] *Id.*

[11] *Id.*

[12] Rec. Doc. 1.

[13] Rec. Doc. 4.

[14] Rec. Doc. 5.

[15] Rec. Doc. 12.

[16] Rec. Doc. 31.

[17] Rec. Doc. 45.

[18] Rec. Doc. 110.

[19] Rec. Doc. 111.

dismissed both CCS and Gusman's motions for summary judgment without prejudice, with leave to refile if necessary.[20]

On December 26, 2018, Plaintiff filed a second amended complaint.[21] In the second amended complaint, Plaintiff brings the following claims: (1) a wrongful death claim under 42 U.S.C. § 1983; (2) a survival claim under 42 U.S.C. § 1983; (3) a claim for deliberate indifference under 42 U.S.C. § 1983; (4) a negligence claim under Louisiana law; and (5) an assault and battery claim under Louisiana law.[22]

On January 9, 2019, CCS filed a motion to dismiss the second amended complaint.[23] On April 29, 2019, the Court granted the motion in part and dismissed the Section 1983 claims pending against CCS.[24] The Court denied the motion to the extent it sought dismissal of Plaintiff's negligence claims pending against CCS.[25]

On May 7, 2019, Gusman filed a second motion for judgment on the pleadings.[26] On June 17, 2019, the Court denied the motion and granted Plaintiff leave to file an amended complaint to include allegations regarding alleged aggravated assault and battery, which were raised in

---

[20] Rec. Doc. 112.

[21] Rec. Doc. 143.

[22] *Id.* at 11–16.

[23] Rec. Doc. 146.

[24] Rec. Doc. 163 at 23.

[25] *Id.*

[26] Rec. Doc. 165.

opposition to the motion for judgment on the pleadings but not in the pleadings, and would not be barred by the statute of limitations.[27] On June 24, 2019, Plaintiff filed a third amended complaint.[28]

On June 3, 2019, CCS filed the instant Motion to Exclude or Limit the Testimony of William Anderson.[29] On June 7, 2019, Plaintiff filed a motion for extension of time to file an opposition to the motion to exclude.[30] On June 11, 2019, Plaintiff filed an opposition to the motion to exclude.[31] Also on June 11, 2019, the Court granted Plaintiff's motion for extension of time in part, giving Plaintiff until June 19, 2019 to file an opposition to the motion to exclude.[32] In accordance with the Court's June 11, 2019 Order, Plaintiff filed a supplemental brief in opposition to the motion to exclude on June 19, 2019.[33] On June 26, 2019, with leave of Court, CCS filed a reply brief in further support of the motion.[34]

## II. Parties' Arguments

### A.    CCS's Arguments in Support of Motion to Exclude

In the instant motion, CCS seeks to exclude or limit the testimony of Plaintiff's expert, Dr. William Anderson, because: (1) Dr. Anderson is a pathologist and lacks the necessary qualifications to offer the opinions on the standard of care referenced in his expert report; (2) Dr. Anderson failed to use or rely on sound scientific principles; (3) Plaintiff's Rule 26 Disclosure

---

[27] Rec. Doc. 201.

[28] Rec. Doc. 210.

[29] Rec. Doc. 180.

[30] Rec. Doc. 194.

[31] Rec. Doc. 196.

[32] Rec. Doc. 199.

[33] Rec. Doc. 203.

[34] Rec. Doc. 214.

fails to meet the requirements for an adequate expert disclosure; and (4) Plaintiff failed to produce Dr. Anderson for a follow-up deposition as requested.[35]

First, CCS argues that Dr. Anderson lacks the requisite qualifications to offer an opinion regarding the medical care provided to Decedent or any alleged delay in care.[36] In support, CCS cites a Louisiana First Circuit Court of Appeal case affirming the exclusion of medical expert testimony because there was no evidence that the doctor was familiar with the degree of care exercised by general physicians in communities similar to where the inmate was housed.[37] CCS also cites a United States Fifth Circuit Court of Appeals case affirming the exclusion of medical expert testimony by a family practitioner who had no experience in spinal cord injuries, which were at issue in that case.[38] CCS asserts that Dr. Anderson lacks the experience as a treating physician or experience in correctional institutions that would allow him to offer any opinion on the standard of care applicable to CCS.[39] CCS argues that any comments regarding treatment interventions, timing of such interventions, patient management, or handling are outside the scope of Dr. Anderson's expertise as a pathologist.[40] CCS asserts that Dr. Anderson's "opinion of an unspecified 'delay' is little more than speculative lay opinion in light of his wholesale lack of expertise in patient care."[41] Because CCS asserts that Dr. Anderson's "testimony, background, and

---

[35] Rec. Doc. 180 at 1; Rec. Doc. 180-1 at 1, 5.

[36] Rec. Doc. 180-1 at 5.

[37] *Id.* at 6 (citing *Berthelot v. Stadler*, 2012-1758 (La. App. 1 Cir. 7/29/13); 2013 WL 3947106).

[38] *Id.* (citing *Honey-Love v. United States*, 664 F. App'x 358 (5th Cir. 2016)).

[39] *Id.* at 6–7.

[40] *Id.* at 7.

[41] *Id.* at 8.

experience readily demonstrate that he lacks the qualifications to offer any opinion on the standard of care," CCS asserts that any attempt to offer this opinion at trial should be excluded.[42]

Second, CCS contends that Dr. Anderson's failure to use scientifically valid principles renders his opinion unreliable under Rule 702.[43] CCS asserts that Dr. Anderson offers the conclusory opinion that a delay in treatment exacerbated Decedent's sickle cell condition.[44] CCS argues that Dr. Anderson does not differentiate between a severe sickle cell crisis resulting from delay in treatment as opposed to the normal development of sickle cell in the later stages.[45] CCS asserts that Dr. Anderson's opinion "is not based on the clinical presentation of the patient, the history of treatment for this patient, or a provider's evaluation of the patient's condition of his then presenting symptoms."[46] Moreover, CCS contends that Dr. Anderson does not identify any scientific basis, experience, background, or evidence to support his conclusory opinion that a delay occurred.[47] Therefore, because Dr. Anderson does not reference any medical literature, scientific studies, or professionally-recognized standards in support of his opinion, CCS argues that the expert's reports and his proposed testimony are unreliable and must be stricken in their entirety.[48]

Third, CCS asserts that the Rule 26 disclosure fails to properly disclose Dr. Anderson's opinion[49] CCS argues that Dr. Anderson's three-page report "makes the blanket, conclusory

---

[42] *Id.* at 9.

[43] *Id.*

[44] *Id.* at 10.

[45] *Id.*

[46] *Id.*

[47] *Id.* at 11.

[48] *Id.* at 12.

[49] *Id.*

statement that the defendants failed to meet the prevailing standard of care."[50] CCS contends that Rule 26 reports may not merely set forth an "ultimate opinion without providing a line of reasoning arising from a logical foundation."[51] Moreover, CCS argues that Plaintiff submitted the March 20, 2018 report without disclosing that Dr. Anderson lacked critical information and data impacting his opinion or that Dr. Anderson could not offer a conclusive opinion.[52] CCS asserts that the December 16, 2018 report offers no additional opinion, instead noting that the original opinion was not changed following review of the supplemental information received from the autopsy.[53] Therefore, CCS argues that the reports should be stricken.[54]

Finally, CCS asserts that Dr. Anderson's prior deposition was continued because he failed to disclose that his opinions were incomplete.[55] CCS contends that it has attempted to reschedule the deposition on numerous occasions, but Plaintiff's counsel has not responded to the request.[56] Therefore, CCS argues that Dr. Anderson's testimony should be excluded on this basis alone.[57]

## B. *Plaintiff's Arguments in Opposition to CCS's Motion to Exclude*

In response to CCS's motion, Plaintiff contends that CCS's argument that Dr. Anderson is unqualified because he is a pathologist is unfounded, because Dr. Anderson is familiar with sickle

---

[50] *Id.* at 13.

[51] *Id.* at 13–14 (quoting *Brainard v. Am. Skandia Life Assur., Cor.* 432 F.3d 55, 664 (6th Cir. 2005)).

[52] *Id.* at 14.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 15.

[56] *Id.*

[57] *Id.*

cell disease and how it should be treated.[58] Plaintiff asserts that Dr. Anderson is not rendering an opinion on what a medical provider did or the manner it was performed, but is providing an opinion that a delay in transferring Decedent to the hospital would not be consistent with prevailing standards of practice in the medical community.[59] Additionally, Plaintiff contends there is no support for CCS's argument that Dr. Anderson is unqualified because he has not worked in a jail.[60] Plaintiff argues that differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.[61] To the extent that CCS argues that Dr. Anderson's testimony is conclusory and without evidentiary foundation, Plaintiff asserts that CCS has cited no cases reflecting similar testimony that was excluded under *Daubert*.[62] Plaintiff contends that CCS's criticisms of Dr. Anderson's testimony go to the weight of the testimony, not its admissibility, and CCS can raise these issues on cross-examination.[63]

Next, Plaintiff asserts that the Rule 26 disclosure is not defective because "[t]he purpose of expert reports is not to replicate every word that the expert might say on the stand [but] instead to convey the substance of the expert's opinion so that the opponent will be ready to rebut, cross-examine and offer a competing expert if necessary."[64] Finally, Plaintiff notes that CCS concedes that it has already deposed Dr. Anderson once, and "it is difficult to imagine how CCS has been

---

[58] Rec. Doc. 196-1 at 4.

[59] *Id.* at 5.

[60] *Id.*

[61] *Id.* (citing *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

[62] *Id.* at 6.

[63] *Id.*

[64] *Id.* (citing *Metavante Corp v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010)).

harmed as it has had one opportunity, and will possibly have another, to question the witness about his opinions."[65] Accordingly, Plaintiff asserts that the motion to exclude should be denied.[66]

### C.    *Plaintiff's Supplemental Arguments in Opposition to the Motion to Exclude*

In the supplemental brief, Plaintiff provides a supplemental declaration of Dr. Anderson explaining the nature of pathology and his qualifications to render an opinion in this case.[67] Plaintiff asserts that the declaration explains that Dr. Anderson "is not criticizing a particular medical provider, and none is referenced in his report, because he is not opining that a single individual doctor violated medical standards; he is saying that the delay by all medical personnel at CCS in taking the decedent to a hospital setting caused the problem, sickle cell, to become worse to the point it could not be reversed."[68] Plaintiff contends that this type of opinion can only be rendered by a pathologist, and CCS has not shown that Dr. Anderson is not qualified as a pathologist.[69] Additionally, Plaintiff argues that the supplemental declaration should resolve any complaint as to the adequacy of the Rule 26 disclosure because it sets forth in detail Dr. Anderson's opinion and its basis.[70] Accordingly, Plaintiff asserts that the motion to exclude should be denied.[71]

---

[65] *Id*. at 7–8.

[66] *Id*. at 8.

[67] Rec. Doc. 203-1 at 5.

[68] *Id*. at 7.

[69] *Id*.

[70] *Id*. at 9.

[71] *Id*.

### D. CCS's Arguments in Further Support of the Motion to Exclude

In reply, CCS asserts that Plaintiff has failed to offer any legitimate basis to support her contention that Dr. Anderson meets the basic requirements of Rule 702 such that he should be allowed to testify at trial.[72] CCS argues that Dr. Anderson is not qualified to provide expert testimony on the standard of care, and he formed his opinions without any factual basis or scientific methodology.[73] Furthermore, CCS contends that Dr. Anderson's declaration is untimely and "serves to emphasize his shortcomings as an expert in this case, not cure them."[74]

CCS first argues that Dr. Anderson admitted that he is not qualified to testify to the standard of care applicable to CCS in this case.[75] CCS asserts that Dr. Anderson's opinion that there was a delay in treatment would necessarily have to be based on the appropriate care, treatment, and management of sickle cell disease, issues on which he lacks any qualification.[76] Therefore, CCS asserts that this opinion must be excluded.[77]

Next, CCS argues that Plaintiff offered nothing to dispute the conclusion that Dr. Anderson lacks the relevant qualifications or experience in providing care and treatment to sickle cell patients.[78] CCS contends that Dr. Anderson's description of the role of pathologists in evaluating autopsies and tissue samples is inconsequential to the standard of care applicable to a medical

---

[72] Rec. Doc. 214 at 1.

[73] *Id.*

[74] *Id.*

[75] *Id.* at 2.

[76] *Id.*

[77] *Id.*

[78] *Id.* at 3.

provider in the evaluation, treatment, and clinical decision making for a patient.[79] Additionally, CCS asserts that Dr. Anderson ignores the fact that Decedent had continuing medical intervention, was on medication for his condition, and was transferred upon making complaints consistent with a sickle cell crisis.[80] CCS contends that Dr. Anderson opines that there was a delay without offering more information on when Decedent should have been transferred, what clinical indicators would support a transfer, and the timing of the transfer.[81] CCS argues that this is the very type of vague, conclusory opinions that the Fifth Circuit discourages.[82]

Finally, CCS contends that Plaintiff has failed to show how Dr. Anderson's reports incorporates any reliable scientific methods under Federal Rule of Evidence 702 or discloses proper expert opinions under Federal Rule of Civil Procedure 26.[83] CCS argues that Dr. Anderson cites Decedent's complaints of pain to support the proposition that the delay caused Decedent's medical crises to become "irreversible," but Dr. Anderson does not rely on forensic pathology principles or other medical expertise to establish how a complaint of pain alone evidences an ultimately-fatal sickle cell crisis.[84] Furthermore, CCS asserts that Dr. Anderson's June 19, 2019 declaration should not be considered because it sets forth new opinions, and was disclosed after the deadline for disclosure of expert reports set forth in the Court's Scheduling Order.[85] Additionally, even if the declaration is considered, CCS contends that it fails to cure the defects in

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.* at 4.

[83] *Id.*

[84] *Id.* at 6.

[85] *Id.* at 7.

the expert disclosure because Dr. Anderson offers no reliable methodology or support for his

opinions.[86] For these reasons, CCS asserts that the Court should exclude Dr. Anderson's proposed

testimony.[87]

### III. Legal Standard

The district court has considerable discretion to admit or exclude expert testimony under

Federal Rule of Evidence 702.[88] Rule 702, which governs the admissibility of expert witness

testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training

or education," may testify when "scientific, technical or other specialized knowledge will assist

the trier of fact to understand the evidence or to determine a fact in issue."[89] For the testimony to

be admissible, Rule 702 establishes the following requirements:

(1) the testimony [must be] based upon sufficient facts or data,

(2) the testimony [must be] the product of reliable principles and methods, and

(3) the witness [must apply] the principles and methods reliably to the facts of the case.[90]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702

requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony

or evidence admitted is not only relevant, but reliable."[91] The district court's gatekeeping function

thus involves a two-part inquiry into reliability and relevance. First, the district court must

---

[86] *Id*. at 7–8.

[87] *Id*. at 8.

[88] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[89] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[90] Fed. R. Evid. 702.

[91] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[92] The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid.[93] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[94]

In *Daubert*, the Court identified a number of factors that are useful in analyzing reliability of an expert's testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[95] In *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert*'s list of specific factors does not necessarily nor exclusively apply to every expert in every case.[96] The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[97] The court must also determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will

---

[92] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[93] *See Daubert*, 509 U.S. at 591.

[94] *See id.* at 590.

[95] *See id.* at 592–94.

[96] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is a fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony").

[97] *Kumho Tire*, 526 U.S. at 152.

thereby assist the trier of fact to understand the evidence—in other words, whether it is relevant.[98] Here, the parties do not dispute the relevance of the testimony.

A court's role as a gatekeeper does not replace the traditional adversary system,[99] and "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[100] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[101] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[102]

## IV. Analysis

As an initial matter, CCS asserts that Dr. Anderson's June 19, 2019 declaration should not be considered by the Court in deciding the instant motion because it sets forth new opinions and was disclosed after the deadline for disclosure of expert reports set forth in the Court's Scheduling Order.[103] Plaintiff disclosed Dr. Anderson's original expert report on March 20, 2018, and a supplemental report, following review of three microscopic slides from Decedent's autopsy on December 16, 2018. In the original report, Dr. Anderson opined that "delayed therapy was the principal factor in the death of [Decedent]" and "[t]his type of delay in addressing the acute

---

[98] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[99] *See Daubert*, 509 U.S. at 596.

[100] Fed. R. Evid. 702 advisory committee's note, "2000 Amendments."

[101] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[102] *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

[103] *Id*. at 7.

medical issues would not be consistent with prevailing standards of practice in the medical community."[104] CCS asserts that Dr. Anderson offers "new" opinions in the declaration. However, the declaration only clarifies the opinions set forth in the expert report stating that the report "indicates that the condition of the patient, based upon the forensic pathological evidence, had progressed, in the absence of medical intervention, to the point that [Decedent] was likely not salvageable at the point he was eventually admitted to the hospital and proper care was provided."[105] Therefore, the Court will consider the June 19, 2019 declaration in deciding the instant motion because it merely clarifies and expands on the opinions set forth in the expert report.

CCS seeks to exclude or limit the testimony of Plaintiff's expert, Dr. William Anderson, because: (1) Dr. Anderson is a pathologist and lacks the necessary qualifications to offer the opinions on the standard of care referenced in his expert report; (2) Dr. Anderson failed to use or rely on sound scientific principles; (3) Plaintiff's Rule 26 Disclosure fails to meet the requirements for an adequate expert disclosure; and (4) Plaintiff failed to produce Dr. Anderson for a follow-up deposition as requested.[106] The Court will address each argument in turn.

## A.    *Qualifications*

CCS attacks Dr. Anderson's qualifications to testify regarding the standard of care applicable to CCS or any alleged delay in care because Dr. Anderson has, in his own deposition testimony, clearly admitted that he lacks the requisite expertise.[107] CCS argues that any comments regarding treatment interventions, timing of such interventions, patient management, or handling

---

[104] Rec. Doc. 203-3 at 3.

[105] Rec. Doc. 203-2 at 2.

[106] Rec. Doc. 180 at 1; Rec. Doc. 180-1 at 1, 5.

[107] Rec. Doc. 180-1 at 5.

should be excluded because they are outside the scope of Dr. Anderson's expertise as a pathologist.[108] In opposition, Plaintiff cites the June 19, 2019 declaration of Dr. Anderson explaining the nature of pathology and his qualifications to render an opinion in this case.[109] Plaintiff asserts that the declaration explains that Dr. Anderson "is not opining that a single individual doctor violated medical standards; he is saying that the delay by all medical personnel at CCS in taking the decedent to a hospital setting caused the problem, sickle cell, to become worse to the point it could not be reversed."[110] Plaintiff contends that this type of opinion can only be rendered by a pathologist, and CCS has not shown that Dr. Anderson is not qualified as a pathologist.[111] In reply, CCS asserts that Dr. Anderson's description of the role of pathologists in evaluating autopsies and tissue samples is inconsequential to the standard of care applicable to a medical provider in the evaluation, treatment, and clinical decision making for a patient.[112]

It is undisputed that Dr. Anderson has extensive experience as a pathologist. Indeed, Dr. Anderson's curriculum vitae indicates that he has over 40 years of experience as a board-certified pathologist, has performed over 7,000 autopsy and clinical patient examinations in medicolegal cases, and has been involved in testimony in over 300 cases in both the criminal and civil justice system.[113] Dr. Anderson's expert report states that he reviewed the medical records of Decedent, and reached the opinion that initial laboratory findings and the clinical history indicate that the

---

[108] *Id.* at 7.

[109] Rec. Doc. 203-1 at 5.

[110] *Id.* at 7.

[111] *Id.*

[112] Rec. Doc. 214 at 3.

[113] Rec. Doc. 203-3 at 19, 21.

exacerbation of Decedent's underlying sickle cell hemoglobinopathy "had been progressing for a period of time prior to his admission."[114] He opines that "delayed therapy was the principal factor in the death of [Decedent]."[115] Moreover, Dr. Anderson states that "[t]his type of delay in addressing the acute medical issues would not be consistent with prevailing standards of practice in the medical community."[116]

CCS does not dispute that Dr. Anderson is qualified to testify to causation, but argues that Dr. Anderson is not qualified to testify to the standard of care. During his deposition, Dr. Anderson admitted that he does not provide any type of medical care to patients in a clinical setting.[117] Dr. Anderson stated that he would not offer an opinion on the standard of care applicable to individual medical care providers, but he will provide an opinion on "the cause of death and the sequence in which these probably occurred."[118] Dr. Anderson further stated that his opinion is based "purely on the time frame, and that's basically from the data that we have and irrespective of who did what at what time," and he will not provide an opinion on what treatment should have been provided.[119] Dr. Anderson explained that "there's a standard of care which all physicians basically adhere to. So I would feel that if something is particularly inadequate from any doctor in any situation, that I would probably have an opinion."[120]

Furthermore, in his declaration, Dr. Anderson states that tissue diagnosis is solely the

---

[114] Rec. Doc. 203-3 at 1–2.

[115] *Id.* at 3.

[116] *Id.*

[117] Rec. Doc. 203-5 at 4.

[118] *Id.* at 4–5.

[119] *Id.* at 5.

[120] *Id.* at 6.

province of the pathologist, and consequently, when issues arise regarding the cause and manner of death, a pathologist must make the ultimate determination, utilizing the information garnered from both the tissues and the laboratory results.[121] Dr. Anderson points out that his report "references the mechanisms" by which the disease progressed, but does not reference any individual medical provider.[122] Instead, Dr. Anderson states that it is his opinion, based upon the forensic pathological evidence, that in the absence of medical intervention Decedent's condition progressed to the point that Decedent was "likely not salvageable at the point he was eventually admitted to the hospital and proper care was provided."[123] According to Dr. Anderson, a review of the materials, including microscopic slides, tissue samples, and medical records, reflects that Decedent "had been in a medical crisis long before he was taken to the hospital," and the delay "lasted so long that it caused the problem to worsen to the point that it could not be reversed."[124]

In support of its assertion that Dr. Anderson is not qualified to testify to the standard of care, CCS cites a Louisiana First Circuit Court of Appeal case affirming the exclusion of medical expert testimony because there was no evidence that the doctor was familiar with the degree of care exercised by general physicians in communities similar to where the inmate was housed.[125] Although state law governs the substance of Plaintiff's negligence claim against CCS, "the Federal Rules of Evidence control the admission of expert testimony."[126]

---

[121] Rec. Doc. 203-2 at 2–3.

[122] *Id.* at 3.

[123] *Id.* at 3–4.

[124] *Id.* at 4.

[125] Rec. Doc. 180-1 at 6 (citing *Berthelot v. Stadler*, 2012-1758 (La. App. 1 Cir. 7/29/13); 2013 WL 3947106).

[126] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002)).

CCS also cites *Honey-Love v. United States*, a United States Fifth Circuit Court of Appeals case affirming the exclusion of medical expert testimony by a family practitioner who had no experience in spinal cord injuries, which were at issue in that case.[127] However, *Honey-Love* is readily distinguishable from this case. There, the expert alleged a breach of care by the VA Medical Center and nurses, who were not parties in the case, and proffered no opinion on the standard of care or any breaches pertaining to the doctors who were named as defendants in the case.[128] Here, Dr. Anderson is providing a more general opinion that a delay in treatment contributed to Decedent's death.

As the Fifth Circuit noted in *United States v. Wen Chyu Liu*, "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."[129] In that case, the Fifth Circuit held that the district court abused its discretion when it excluded the testimony of an expert with extensive experience working in chemical plants and 50 years of engineering experience in a variety of high-level positions, finding that he had worked with polymers that had "many similarities" and "a lot of commonality" with the manufacturing process at issue in the case, even though he lacked experience with the specific substance at issue.[130]

Similarly, in *Huss v. Gayden*, the Fifth Circuit held that a district court erred in excluding the testimony of a board-certified internist that the drug administered by the defendants did not

---

[127] Rec. Doc. 180-1 at 6 (citing *Honey-Love v. United States*, 664 F. App'x 358 (5th Cir. 2016)).

[128] *Id.* at 360.

[129] *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

[130] *Id.* at 169.

cause or contribute to the plaintiff's cardiomyopathy.[131] The Fifth Circuit noted that the internist practiced for fifteen years, treated patients with enlarged hearts and cardiomyopathy, prescribed drugs similar to the one prescribed by the defendants, and his anticipated testimony was a natural extension of his medical and public health training.[132] The Fifth Circuit reasoned that "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."[133]

Here, Dr. Anderson's curriculum vitae indicates that he has over 40 years of experience as a board-certified pathologist, has performed over 7,000 autopsy and clinical patient examinations in medicolegal cases, and has been involved in testimony in over 300 cases in both the criminal and civil justice system.[134] Furthermore, Dr. Anderson's curriculum vitae indicates that he has published several papers on how forensic sciences can aid the clinician.[135] He also developed "a comprehensive program in clinical forensic medicine . . . [u]tilizing the data gathered from non-surviving trauma patients, in a prospective manner, through [] extensive educational and consultative interactions with providers."[136] This "information is used by the clinician to better appreciate the distribution of damages that might be expected in specific types of patient trauma situations, and improve the effectiveness of various diagnostic and therapeutic approaches."[137]

---

[131] *Huss v. Gayden*, 571 F.3d 442, 455 (5th Cir. 2009).

[132] *Id.* at 454.

[133] *Id.* at 452.

[134] Rec. Doc. 203-3 at 19, 21.

[135] *Id.* at 25–27.

[136] *Id.* at 22.

[137] *Id.*

Thus, Dr. Anderson does have experience assisting medical providers in applying forensic data to make improvements to care provided to patients in the clinical setting. Additionally, during his deposition, Dr. Anderson testified that he reviews clinical records in conjunction with the performance of most autopsies to determine what transpired.[138]

Dr. Anderson is qualified to opine regarding the cause of Decedent's death and the standard of care to which all physicians adhere. Moreover, Dr. Anderson has stated that he will not provide specific opinions related to the clinical care of Decedent or what treatment should have been provided. Instead, Dr. Anderson will provide an opinion as to the mechanisms by which the disease progressed, including his opinion that there was a delay in treatment contributing to Decedent's death, which deviated from prevailing standards of practice in the medical community.[139]

Although CCS unfavorably compares Dr. Anderson's qualifications with regard to clinical care of a patient in a jail setting to that of Dr. Richard Inglese,[140] an expert retained by the defendants, such a comparison is irrelevant to the consideration of whether Dr. Anderson is qualified to testify in this matter. "[T]he *Daubert* standards are flexible, and the most important question is not whether one party's expert is more qualified than the other's, but rather, whether an expert's testimony is reliable."[141] If CCS believes Dr. Inglese is the more qualified expert, they are free to argue so to the jury. Dr. Anderson may be less qualified regarding clinical care of a patient in a jail setting, but he is not insufficiently qualified to opine as to the cause of Decedent's death or general standard of care principles applicable to all medical professionals. The Court therefore

---

[138] Rec. Doc. 203-5 at 6.

[139] Rec. Doc. 203-2 at 3.

[140] Rec. Doc. 186-1.

[141] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).

declines to exclude Dr. Anderson's testimony on the ground that he is not qualified as an expert.

**B.    *Reliability***

Next, CCS asserts that Dr. Anderson's opinion that a delay in treatment exacerbated Decedent's sickle cell condition "is not based on the clinical presentation of the patient, the history of treatment for this patient, or a provider's evaluation of the patient's condition of his then presenting symptoms."[142] Moreover, because Dr. Anderson does not reference any medical literature, scientific studies, or professionally-recognized standards in support of his opinion, CCS argues that the expert reports and his proposed testimony are unreliable and must be stricken in their entirety.[143] In response, Plaintiff asserts that CCS has cited no cases reflecting similar testimony that was excluded under *Daubert*, and that these arguments go to the weight to be afforded to the testimony, not admissibility.[144]

As noted above, when expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony.[145] "To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology."[146] Rather, some objective, independent validation of the expert's methodology is required.[147] However, as a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the

---

[142] Rec. Doc. 180-1 at 10.

[143] *Id.* at 12.

[144] Rec. Doc. 196-1 at 6.

[145] *Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir. 1998).

[146] *Dearman v. Transocean Offshore Deepwater Drilling, Inc.*, No. 11-750, 2012 WL 441167, at *5 (E.D. La. Feb. 10, 2012) (Fallon, J.).

[147] *Moore*, 151 F.3d at 269.

jury's consideration."[148]  It is "the role of the adversarial system, not the court, to highlight weak evidence."[149]

The test of reliability is "flexible" and *Daubert*'s list of specific factors does not necessarily nor exclusively apply to every expert in every case.[150] In *Kovaly v. Wal-Mart Stores Texas, L.L.C.*, the Fifth Circuit acknowledged that, in considering the reliability of some professionals, such as pharmacists, certain *Daubert* factors will not readily apply, and courts "must consider other factors when determining admissibility, such as whether the expert has enough education and relevant experience to reach a reliable opinion."[151] Therefore, the Fifth Circuit "has upheld the admission of expert testimony where it was based on the expert's specialized knowledge, training, experience, and first-hand observation while supported by solid evidence in the scientific community."[152]

Here, the Court finds that Dr. Anderson has reliably drawn upon his specialized knowledge and experience to arrive at his conclusions. Dr. Anderson considered numerous documents and other sources of evidence in preparing his opinion. These items include records from the jail, records from University Medical Center, the autopsy report, and microscopic slides representing tissue samples from Decedent's heart, lung, liver, spleen, and kidney.[153] Furthermore, as noted

---

[148] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).

[149] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

[150] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is a fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony").

[151] 627 F. App'x 288, 291 (5th Cir. 2015) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)).

[152] *Pipitone*, 288 F.3d at 247.

[153] Rec. Doc. 203-3; Rec. Doc. 203-4.

above, Dr. Anderson has over 40 years of experience as a board-certified pathologist, has performed over 7,000 autopsy and clinical patient examinations in medicolegal cases, and has been involved in testimony in over 300 cases in both the criminal and civil justice system.[154] Dr. Anderson has published several papers on how forensic sciences can aid the clinician,[155] and developed a program that utilizes data gathered during autopsies to make improvements to care provided in the clinical setting.[156]

Additionally, Dr. Anderson's declaration explains that it is the role of the pathologist to examine tissue and laboratory diagnostic procedures "to determine the changes that occur during the progression of those processes."[157] Dr. Anderson states that he relied on his training as a pathologist to make a determination regarding the cause and manner of death, "utilizing the information garnered from both the tissues and the laboratory results."[158] Dr. Anderson relied on this experience and methodology in forming his opinion. Therefore, this Court concludes that Dr. Anderson's opinions are reliable under Federal Rule of Evidence 702 and the Supreme Court's holding in *Daubert*.

## C.     Compliance with Rule 26(a)(2)(B)

Next, CCS asserts that the Rule 26 disclosure fails to properly disclose Dr. Anderson's opinion.[159] CCS argues that Dr. Anderson's three-page report "makes the blanket, conclusory

---

[154] Rec. Doc. 203-3 at 19, 21.

[155] *Id.* at 25–27.

[156] *Id.* at 22.

[157] Rec. Doc. 203-2 at 2.

[158] *Id.* at 2–3.

[159] Rec. Doc. 180-1 at 12.

statement that the defendants failed to meet the prevailing standard of care," without laying out the reasons for the opinion.[160] Moreover, CCS argues that Plaintiff submitted the March 20, 2018 report without disclosing that Dr. Anderson lacked critical information and data impacting his opinion or that Dr. Anderson could not offer a conclusive opinion.[161] CCS asserts that the December 16, 2018 report offers no additional opinion, instead noting that the original opinion was not changed following review of the supplemental information received from the autopsy.[162] In response, Plaintiff asserts that the Rule 26 disclosure is not defective because "[t]he purpose of expert reports is not to replicate every word that the expert might say on the stand [but] instead to convey the substance of the expert's opinion so that the opponent will be ready to rebut, cross-examine and offer a competing expert if necessary."[163]

Federal Rule of Civil Procedure 26(a)(2)(B) states:

Unless otherwise stipulated or ordered by the court, [an expert] disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

---

[160] *Id.* at 13–14.

[161] *Id.* at 14.

[162] *Id.*

[163] Rec. Doc. 196-1 at 6 (citing *Metavante Corp v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010)).

"The expert report should be 'detailed and complete,' stating the testimony that will be presented during direct examination and the reasons therefor."[164]

CCS argues that Dr. Anderson's report fails to meet the requirements under subparts (i) and (ii). The Court finds this argument unavailing. The report states that is based on the autopsy report, the medical records from CCS, and the medical records from University Medical Center.[165] Additionally, Dr. Anderson summarizes the portions of the medical records upon which he specifically relied.[166] As discussed above, Dr. Anderson will opine that there was a delay in medical treatment, which contributed to Decedent's death, and that this delay is not consistent with prevailing standards of practice in the medical community. Accordingly, the Court finds that Dr. Anderson's report meets the requirements of Rule 26(a)(2)(B).

Equally unpersuasive is CCS's argument that the report should be excluded because Plaintiff did not disclose that Dr. Anderson lacked critical information and data impacting his opinion or that Dr. Anderson could not offer a conclusive opinion when she disclosed the March 20, 2018 report. The March 20, 2018 report states that Dr. Anderson "reserve[s] the right to modify these opinions in the event further data become[s] available."[167] The morning of Dr. Anderson's deposition he learned that microscopic slides from Decedent's autopsy, which the parties were previously told were destroyed, were in fact available.[168] Dr. Anderson stated that he needed to

---

[164] *Honey-Love*, 664 F. App'x at 361 (citing Fed. R. Civ. P. 26 Advisory Committee's Notes (1993 Amendments).

[165] Rec. Doc. 203-3 at 1.

[166] *Id.* at 1–2.

[167] *Id.* at 3.

[168] Rec. Doc. 203-5 at 9–10.

look at the slides to confirm the opinions provided in his prior report.[169] Dr. Anderson submitted a supplemental report on December 16, 2018, after reviewing the slides, stating the slides further supported the conclusions reached in his original report.[170] Accordingly, the Court finds that this is not a basis for exclusion of Dr. Anderson's testimony.

### D.   Production of Dr. Anderson for Another Deposition

Finally, CCS asserts that Dr. Anderson's prior deposition was continued because he failed to disclose that his opinions were incomplete.[171] CCS contends that it has attempted to reschedule the deposition on numerous occasions, but Plaintiff's counsel has not responded to the request.[172] In response, Plaintiff notes that CCS concedes that it has already deposed Dr. Anderson once, and "it is difficult to imagine how CCS has been harmed as it has had one opportunity, and will possibly have another, to question the witness about his opinions."[173] Plaintiff does not explain why a supplemental deposition has not been scheduled. The Scheduling Order provides that depositions must be completed no later than June 12, 2019.[174] Nevertheless, the Court will grant the parties until August 2, 2019 to complete the supplemental deposition of Dr. Anderson.

---

[169] *Id.* at 10.

[170] Rec. Doc. 203-4.

[171] Rec. Doc. 180-1 at 15.

[172] *Id.*

[173] Rec. Doc. 196-1 at 7–8.

[174] Rec. Doc. 144 at 4.

## V. Conclusion

Based on the foregoing, the Court finds that CCS has not set forth a basis for exclusion or limitation of the testimony of Dr. William Anderson. However, the Court will grant the parties until August 2, 2019 to complete the supplemental deposition of Dr. Anderson. Accordingly,

**IT IS HEREBY ORDERED** that CCS' Motion to Exclude or Limit the Testimony of William Anderson[175] is **DENIED.**

**IT IS FURTHER ORDERED** that the parties are granted until August 2, 2019 to complete the supplemental deposition of Dr. Anderson.

**NEW ORLEANS, LOUISIANA**, this  17th  day of July, 2019.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[175] Rec. Doc. 180.